The last case for this court today is Brink v. Gully. That's case number 4110387 for the appellant, Donald Heck Jr. for the appellee, Donald R. Shearing. Mr. Heck, please proceed. Thank you. May it please the court, Mr. Shearing. Justices, in this case, I think that the evidence is clear on review or in reasonableness or logic that Judge William Mays has made a mistake and put in a brief. We believe that the issue to be ruled upon, again in a brief, is whether or not my client, who is Joe Ann Gully, should have received this ring. I don't think that there's any question about the law. There's some questions about the facts, but you have, before you, certainly I know have been presented with the transcript in this case. As is argued or set forth in my brief, there are basically issues that have to be determined as far as whether or not this gift was a completed gift. And there's no question in my mind, and I think the record fully supports the fact, that it was not only a completed gift, it certainly was a gift and the intent was there and the entire matter resolved. As, again, we put forth in the brief, we have to have the issue of intent to make a gift. That the intent of the donor was to make a gift. And when you look at this, when you look at the facts that are presented, overwhelmingly it was Mr. Frank's intent to make this a gift to his significant other, fiancee, depends on where they were at in their relationship, his girlfriend, his living girlfriend. My client, Joanne. Now, Mr. Shearing, in his brief and somewhat of his argument, puts forth the fact, well, he's got a lot of money, basically. He didn't say that, but that's what he said when he puts in there that Mr. Frank, he owns a Ford dealership, Mr. Frank owns a business of some repute in our area called Game Masters, and he's involved in many, many other businesses. But that's not what this is about, but I do think it supports our position even more. Now, Mr. Frank is not an impoverished man. He has a lot of money. Mr. Frank gave and gives a lot of gifts. Not only to others, which I don't know if that's relevant to what we're doing here or the argument, but it is concerning Joanne. He gave her a car. Not a car, he gave her a new car. Now, we went up and down on that in the evidence, but it's in the record. He gave her a new car. He gave her many other expensive gifts, and then we get to the crux of this argument, the crux of the trial, and that's his ring. And it was always amazing to me from taking the depositions to trying the case that he got a ring that was $28,000 from Grizzly in an overpass outside of Hamel, Missouri, or somewhere down in Missouri. Now, I found that, and I think that just goes to his credibility. How many men of the reputation, if you will, of Mr. Schering painted for him, or how many people go to some guy in the backseat of a car and buy a $28,000 ring? That's a little question, I think. We tried the case. No, the question is, what's he really doing here? How is he credible? I think the question is, if you're going to spend that kind of money, I know that I wouldn't, and I doubt if any of you... Are you implying that he did something illegal? I don't think he did anything illegal. I think he did something underhanded. I don't think he did something illegal because he went and he bought a ring from somebody in the backseat of a car for $28,000. Maybe he just got a good deal. Maybe he did, but I doubt very much if anyone in reason or logic or anything like that would go in an overpass and buy a $28,000 ring, especially a woman's ring. What does that matter? Well, I mean, it only matters... The issue is whether or not he intended to make a gift of the ring. Exactly. How he got the ring, whether he bought it at a jewelry store, whether he bought it from just some guy, whether he bought it knowing it was hot. Okay. Matters not. Well, the only thing, and I agree with that, except from the standpoint that I think that what we have here is somewhat a question of credibility, and then it goes on beyond that. It's how did she get the ring? And she got the ring as a gift. Now, she got the ring, I don't think there's any question about that, in my mind at least. She got the ring as a birthday gift, and Mr. Brink testified that he gave her the ring, but it wasn't a birthday gift. We put in the evidence, it was in the brief. He gave her that ring as a birthday gift, signed it with his quirky name Clyde, their name that she called him, I don't know why, never got into that. She was given that ring as a birthday gift, and he put on the... He said he put it on a napkin on a plane, but it's not on a napkin on a plane, it was put on a piece of paper. And it said, just as it was put in the brief, he put in there something to the effect that, well, I spent all the money on the ring, I didn't have any money for a card, and gave it that way. Now, that's consistent with facts, that's consistent with the evidence in the case. Now, what happened then, is I put forth in the brief, is they were together for years after that. We have pictures and evidence, we have testimony and evidence. The only thing that happened was, was that Joanne Gulley left Steve Brink, that they had a breakup, it was over. Their relationship was over, and before that time, before the relationship, it's inconsistent to believe that he didn't give her that ring, because if he wanted it back, he should have gotten it back. If he couldn't get it back, he would have called the police, as I put it in the brief. If that was not her ring, which she wore, it wasn't sized for her, it was bought to fit her hand, and she wore it on several occasions. Now, to rebut the... Just as an aside, I'm trying to get my mind around the idea of the jeweler in the backseat of the car on the Hannibal Overpass sizing the ring. But I think what happened was, he didn't size the ring, I think it was bought, that size, Steve Brink, from the record, you can, certainly it's in the record, had bought her rings before. He knew what size ring that she wore. It wasn't a question of luck, or it wasn't a question of him sitting there sizing the ring, that's not what happened. He bought that ring for her, in her size, and gave it to her as a birthday gift. Now, to rebut that, he says, well, I didn't give it to her as a gift, it was more of an investment. Well, it wasn't an investment, because it was given to her to wear, it was given to her to show off, it was given to her to show friends. Then, he said, oh no, it wasn't. Well, we called, and I think a credible witness was Joanne Upshieldy, who came before the court, had absolutely nothing to do with anybody in the case whatsoever, and said she was, I guess, a trap shooter or a shotgun, Joanne was, a shooter at West Quincy Gun Club, and she went over there and saw, on numerous, numerous occasions, my client, Joanne Gulley, wearing that ring, which she did. And to rebut that, Mr. Brink then called in his former employee, and that guy, I don't know why he called him. He came before the court, as again is put forth in the brief, and when he came before the court, he didn't know anything. He knew he went to the gun club, he really didn't know anything. You're talking about Bill Pound? Bill Pound, yes sir. Bill Pound didn't know anything. He then called two different witnesses to help support his position. The one was his business partner in several different ventures, Dwayne Beverlo. Dwayne Beverlo was, is a business partner with him at that time, now, and perhaps even expanded that, but that's not important. He not only had a business relationship, he had a financial relationship with Steve Brink. But then they called in Julie Brink, the wife, and that is totally inconsistent. We put in the evidence, because when they were breaking up, when Brink and Gulley were breaking up, Mrs. Beverlo gave to her, and it's sent forth in my brief, gave to her a beautiful jewelry box to put her ring in. And contrary to what Mr. Shering says, in his brief, she didn't say she gave her a card and the ring at the same time. It's sent forth in the transcript, she gave her a card and she gave her this jewelry box. And the jewelry box is just beautiful, it's an evidence. And that was to put her ring in. And she knew, Julie at that time, knew it was Joanne's ring, and in fact gave her this jewelry box to put it in. So when you... She's a Beverlo also. She's a Beverlo, she is a... But because she's the spouse of his business partner, she's objective, but Mr. Beverlo is not objective. No, I'm not saying that. Well, you made it sound as if because Duane is the business partner, you can't believe what he says, and he's saying something contrary. Agreed? Well, he's not saying anything contrary. What he was there for was for the ring being taken out of the vault, I think it was in 2005. But what I'm saying is, is the evidence is contrary, the fact that she, meaning Julia, gave to Joanne Gulley this jewelry box. Again, it's not a little bitty jewelry box, this is quite an elaborate thing, to put her ring in. And I think that is logical, reasonable, and consistent with the fact that everybody at that time knew that that was her ring. What about Mrs. Borowman? Mrs. Borowman testified that she saw her, I believe at a Christmas party, wearing the ring. And the defendant said plaintiff bought me the ring, and then plaintiff denied ever giving her the ring. Borowman testified to that. Yes. So she's observing this conversation. Maybe she compliments the ring. Your client says, he gave this to me, and he says, no I didn't. I didn't give you that, and they both say it's not an engagement ring. Well, why is that just as credible as what the other people are saying? It is. Or just as, obviously it's relevant. It's relevant, I don't know that it's credible. What? And the reason I don't know that it's credible is what everybody else is saying, is that she, meaning she knows what Brink said. She testified what Dulley said, but the facts surrounding it, she had no knowledge of. She didn't know about the gift. She didn't know about the card. She didn't know about, I don't have any money for a card. Back to Vedderlo. He says, I asked plaintiff, when's the wedding? Plaintiff responds, I'm not sure I'm giving it to her yet. That's the ring. Well, that's during the very same time period that everybody says it's her ring. Well, she's had that ring at that point, sir, for several years. She got the ring. That's why Vedderlo and his wife were called to say that all of this took place at that 2005 deal when Vedderlo and Brink, they came to Brink's house to shoot this expensive, I think it was Vedderlo Dulley. Vedderlo makes, his testimony is related to December 2005. Yeah, but she had the ring before that. That's what I'm saying. She had been given that ring. These people were in turmoil at this time. Brink, they hadn't broken up, but Brink and Dulley were on the rocks, let's put it that way. Well, except that the ring is in the vault, because that's what Julie testifies to. But the ring was not in the vault then. She says it was in the vault because she saw a defendant reach in the vault and pull it out. That's what I'm saying, she took it out, but it was in the vault, but the defendant, Dulley, took it out of the vault. Which meant it was kept locked in Plaintiff's vault. At the same time, the plaintiff is saying, I'm not going to give it to her. I don't know if I'm going to give it to her. But Joanne Dulley had complete access to that. Well, that's disputed. That is disputed. You're painting a very good picture. The question is, whether any of the picture you're painting is erased or disputed by the other side. And the answer is, yeah, there's a dispute about all of it. There is a dispute about all of it, but I think you have to look at the logic and the credibility of it. I mean, I understand that. I also understand that when we tried this before Judge Mays, that we didn't try it all at one time. We tried it on several different days, and this thing was going up and down and around, and every time you said something, they'd run out and get somebody else to come in and say something different. My point is, is that reason and logic doesn't follow the Brink story. Reason and logic doesn't follow the fact that there was this intent, there was this completed gift, and there was no question about that in reason, logic, and in the evidence. Now, was there disputed evidence? Absolutely. There was disputed evidence. Was there evidence that one side or the other? There's no doubt about that. That's what disputed evidence is. But the fact of the matter is, as it's put forth in the brief, that what they're saying is, why would Mrs. Beverlow spend that kind of money? And I think you have to look at this jewel-encrusted, and I don't know what kind of jewel, but in this ring box, and give it at that time to somebody, I have to assume, you don't give a gift like that to somebody that's not your friend, if she didn't know in her mind and heart that that was her ring. Why give her that for a ring that she didn't know? Why give her that for something that Steve Brink said he didn't complete? They all knew it. They may not have testified to it, but they all knew it from the reason, the logic, and the following of the facts. Then when we go through... Counsel, I see your problem is this seems to be more of a closing argument for the fact finder, and we're not the fact finder. You're not the fact finder. All I'm saying is that when the arguments were made, that after that, that was the second day of the trial. We had been up. We'd been down. There'd been some dispute about the ring, who had the ring, where was the ring. Judge Mays ordered the ring to be brought into court and filed with the clerk of the court, which is where it remains today. And I think that in review of this, when you review it in light of not only my argument, but even if you take it in the nature of a closing argument, you can see, as I put it in the brief, and that's why we're here, that Judge Mays, in my opinion, I've known Bill Mays for years and years, and I think he's very astute, but he made a mistake. Everybody makes mistakes, and this is a mistake. To come before the court, there's always a dispute. We don't come before your honors or this body or any other appellate court or the Supreme Court if one side or the other doesn't feel that there's a mistake. But in this case, I think that the evidence was taken logically, reasonably, and under the everyday facts, and a trial court judge or anyone else doesn't throw those away when it comes to the bench. When you do that and when you follow that logic, the decision here doesn't lie. That ring was given to Joanne Gulley. She wore the ring. We have pictures of her with the ring on. She took it to parties. She was all over with that ring. It was her ring. And then after the breakup, after she left Steve Bank, then for the first time he says, I want it back. She had it. So I certainly would be glad to answer any questions that you have. I'd like to answer any factual questions, if you have any. And I think when you look at the card, when you look at the facts, for example, like Ms. Upshielding, she had no reason to lie. She had no interest whatsoever in here. So I ask the court to review this, which I know you will. I ask the court to reverse Judge Mazur's decision. Thank you very much. Thank you. Thank you. Mr. Shearing? May it please the court and Mr. Heck, as Judge May stated in his opinion, there was much inconsistency in the testimony at the two-day trial, but Judge Mays, being the trial judge, had the opportunity to review the witnesses and to look at the credibility of the parties. I'd like to address some of the issues brought up by Mr. Heck. And first of all, in regards to this car, there was testimony from Ms. Gulley in regards to a car that she received. And there was a first implication that she received at Christmas time a brand-new Cougar. There was rebuttal testimony offered that that, in fact, is not what occurred. She traded in a car that was in April. And Mr. Brink did pay $1,000 towards the difference. That was unrebutted. Documents were introduced. So he, in fact, did not give her a new car as she first attempted to indicate. And I really don't think it's that relevant, but I think I have an obligation to Mr. Brink to address maybe his relationship with Mr. Slayton or his nickname was Grizzly. He knew him from the Ozarks, and that's in the testimony. He had bought jewelry from him before as a broker. He was at an estate sale in Springfield. He called Mr. Brink on the phone going back to the Ozarks, which would take the route through Hannibal, Missouri. Called him and said, I have this ring. I just thought you may be interested in it. Told him how much it was. They did meet at an underpass. And Mr. Brink looked at the ring and bought it. Mr. Brink never testified in trial that he had any intent to give it to Miss Gulley as a birthday gift. In fact, these parties were only seeing each other. How do you explain the note? Well, if you look at the note, I think you have to look at a language of the note. It basically said, you know, the card is it. The ring, in fact, broke me. But I think you need to look at the language of that note. It's not a note. There's nothing in there saying anything about this being your birthday gift. In fact, Mr. Brink indicated he bought the ring, he thought, in the summertime, not at the time of her birthday. So I think if you look specifically at the language of that note, there's no indication in that note that it, in fact, addressed the ring being a birthday gift. I think if you look at the surrounding circumstances, you're talking about a ring that he bought for $28,000 that has now been appraised for anywhere from $45,000 to $51,000. I doubt very seriously if that would, in fact, have been a birthday gift. He bought it for one of two reasons. Either it was going to be an engagement gift or it was going to be an investment for him. The engagement was depending on how the relationship with him and Miss Gulley progressed. He maintained possession of that in the safe. There's no question that she did wear the ring. We dispute that she wore it to the gun club. There's testimony from Mr. Brink as his involvement in the gun club. There's testimony also from the Venvolos, who, again, their testimony was, their credibility was weighed by Judge Mays, as them being at his residence in December of 2005, that he removed the Brasi guns, that he was not even a dealer for Brasi until two years before that, from the safe. They went outside, the safe was open, and Miss Gulley removed the ring from the safe. There's also testimony from her that she did not have access to the safe. Mr. Heck mentioned about not calling the police. I just incorrect that there was a report made to the Sheriff's Department and an investigation. So he bought this ring as either an investment or if the relationship between him and Miss Gulley got to the point where there was going to be an engagement, he was going to use that as an engagement ring. There was testimony from one of the jewelers that we called in regards to this type of ring, that she generally did not give that type of ring as a gift, as either an engagement ring or a wedding ring. Even Miss Gulley testified that at some point she stated that Mr. Brink said he wanted to give that to a person that he was seeing. Well, first of all, since he has married, but that relationship didn't even start until April of 2006 after Miss Gulley and he broke off their relationship. And she was asked what this ring was going to be for, how he was going to treat this ring if he was going to give it to Kelly, the person he started seeing in April, and her comment was, well, I assume it to be an engagement ring or a wedding ring. That is in the record in regards to her testimony. But again, he didn't even start seeing her until I think it was April of 2006. I think the other testimony from Miss Gulley relative to her credibility had to do with many things. I think what stands out to me is her testimony in regards to putting the ring in a safe deposit box at the Berry Bank. She went, her saying that she did, or her mother did it, that it was her mother's box. And then she said, no, she did it, that she put the box, or put the ring in the safe deposit box. We called the person from the bank, Berry Bank, to testify that there was no indication at any time either Joanne Gulley or her mother were in the box. And secondly, the box was, the safety box was not in the name of Joanne Gulley's mother, but was in her father. She, later on in her testimony, says, well, that was maybe partially untrue. And tried to say, well, I told that story because I was concerned about Mr. Brink, I mean, getting the ring. Well, that's, you know, she may have told Mr. Brink that, but she also testified under oath that that is what she did. So, again, I think throughout this, her credibility, I think Judge Mays weighed her credibility with that issue. This Court, as the Court is aware, has the obligation to review it based upon the manifest way of the evidence. Ms. Gulley had to prove by clearing convincing evidence. Well, let me ask you about that, counsel. The case of Carol B. Curry says that in a replevant action, the plaintiff bears the burden to allege and prove that he or she is lawfully entitled to possession of the property. This is a replevant action. You represent the plaintiff petitioner. How did you, based upon the case I just read to you, convince the trial court to shift the burden of proof to the respondent to prove that the ring was a gift by clearing convincing evidence? I think if you look at the Simmons case, I think first I think we proved that Mr. Brink purchased the ring, that he had the ring in his possession, in his safe, from his testimony that, you know, it was not a gift. And I think at that point in time the burden shifts, and in order to refute that... It shifts even though it remains in her possession? The burden shifts even though the ring remains in her possession? I think if you look at the Simmons case, I think it does shift, and then they have... So the burden of proof with regard to a replevant action shifts over when there is a question of gift, when the replevant involves a personal item that is alleged to be a gift? Again, I think if you look at the Simmons case... The Simmons case says so. I think if you're... And even in that case, I think it was a daughter-in-law, I think was also actually wearing this, you know, piece of jewelry. But, you know, that case did hold it. They're actually showing it by clearing convincing evidence that there was, in fact, a gift made of that item. In any event, it doesn't appear to me that the defendant actually contests that the burden of proof was hers, so... I have nothing further argument unless you have any questions. Seeing none, thank you. Rebuttal. Thank you. Again, may it please the Court. Justices, when you listen to what he said, and you review the record, it goes right back to what I said. And I think it was Justice Appleton, and I'm sorry, but it could have been you, Justice Turner. Why is it important about grizzly? Why is that important? It's important about credibility. It's important about credibility. Why is it important about the note? It's important because Mr. Schering is trying to take the light off the note because the note, it was given at a birthday time, and it's in... And I put it on page 14 of the brief. It's in the transcript, volume 3, page 18, lines 3 through 5. And it says, quote, your birthday card. The ring broke me, so this is it. What logically does that mean? He gave it, and the testimony was, she got, Gulley got the card with the ring. But then it goes on to say, but now you know I really love you. Love, Clyde. Now, if that's not a birthday gift, if that's not a completed gift, I don't know what is. But when it comes to credibility, Schering says, ignore that. Ignore all of that because he really didn't mean it. Well, he didn't mean it because the same way with this Cougar thing. This is not a case where we just showed up one day and tried. There was some significant discovery in this case. He knew where we were coming from. He, meaning Jim City Ford, his company, had complete control of all those papers. We didn't have them. She didn't need them. It was a gift from her boyfriend, fiance, significant other. She didn't need the paperwork, and all of a sudden he says, look what I got. But he had them all along. He could have paid paperwork to say anything he wanted to. He had papers after paper after paper. We had no way to rebut that. He had it. But she said, he gave me significant gifts, including the Cougar. So to just say, well, let's just forget about that, and it really wasn't rebutted, it wasn't. It simply, just like everything else, the defense, if you will, or the plaintiff's case was built around the facts that were true facts. Once he knew what it was, then he built his story. But it falls apart, particularly when you look at the Simmons case or any other case, it falls apart with that birthday card. And I think it falls apart even more when you look at that birthday card in conjunction with the ring box. It has to. It makes no sense otherwise. And to say that she had no access to that, to that safe, isn't true. She did have access. She had access for a long time. Now she didn't at the time the suit was filed. She didn't as it deteriorated. But she was in that safe on several occasions, and the record shows that. So to say that the police were called, for example, please, and I know you will look at the record, the police were called after. All of this took place like a type of ring. We put on Steve Sherhine, not the other guy that they called, who was another guy selling on the fly. Steve Sherhine was one of the most reputable jewelers in Quincy. And he testified, this could be any number of rings. It could be a cocktail ring. Yes, it could be an engagement ring, but it could be a cocktail ring. I know I'm running out of time here, but the manifest way the evidence in this case, in light of all the facts, in light of everything, taken in reason and logic, falls on my side or Joanne Kelly's side, and I ask this court to reverse it. Thank you. Okay, thanks to both of you. The case is submitted. The court stands in reason.